UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THOMAS R. AMES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 16 C 9213 |
| v. | ) |
| | ) Chief Judge Rubén Castillo |
| JOHN BALDWIN, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Thomas R. Ames ("Plaintiff") brings this action under 42 U.S.C. § 1983 against Stateville Correctional Center ("Stateville") employees Joel Shaw, M. Hudson, Anna McBee, and Randy Pfister, as well as Illinois Department of Corrections ("IDOC") Administrative Review Board members Sherry Benton and John Baldwin. (R. 12, Am. Compl.) Defendants McBee, Pfister, Benton, and Baldwin (referred to herein as "Moving Defendants") seek dismissal of the claims asserted against them pursuant to Federal Rule of Civil Procedure 12(b)(6). (R. 30, Mot.) For the reasons set forth below, their motion is granted.

## RELEVANT FACTS

Plaintiff was incarcerated at Stateville from December 1999 until September 2015. (R. 12, Am. Compl. ¶ 4.) During his time at Stateville he held several jobs, including working in the kitchen. (*Id.* ¶¶ 4, 12.) His responsibilities in the kitchen included managing day-to-day operations, unloading food from supply trucks, and keeping inventory. (*Id.* ¶¶ 13-14.) Some kitchen workers prepared food trays for inmates who could not leave their cells, but Plaintiff was not involved in this task. (*Id.* ¶ 14.)

On or about September 2, 2015, Plaintiff was working in the kitchen when he was "suddenly and unexpectedly" escorted to the office of Shaw, an internal affairs officer at Stateville. (*Id.* ¶ 15.) Shaw allegedly informed Plaintiff that he was conducting an investigation into "excess food materials [found] on food trays around the prison." (*Id.*) Plaintiff claims Shaw was "threatening and coercive" in his manner and told Plaintiff that "someone has to go down for all this stuff." (*Id.*) He repeatedly told Plaintiff to "tell [him] something" and threatened that if he failed to do so he would lose his job in the kitchen. (*Id.*) Plaintiff took Shaw's statements to mean that he was not actually interested in finding the culprit and instead wanted Plaintiff to "identify anybody, regardless of whether he had actually done anything wrong." (*Id.*) Plaintiff told Shaw that he had no information about the food trays, at which point Shaw became "visibly angry and agitated" and the interview ended. (*Id.* ¶ 16.)

Later that day, Plaintiff filed a grievance about his interaction with Officer Shaw with Hudson, a counselor at Stateville, to "document Officer Shaw's threatening and coercive tactics." (*Id.* ¶ 17.) In the "relief requested" section, he asked that "these threatening and coercive practices stop immediately and that I not be punished for not knowing anything, not making anything up, and not putting myself in harm's way by conveying their 'threatening messages' to other dietary workers." (R. 12-1, Grievance at 3.)

Approximately one week later, Plaintiff and five other kitchen employees were notified by the dietary manager (a non-party) that they were being terminated from their jobs because of the excess food found on trays around the prison. (*Id.* ¶ 18.) Two of the employees received disciplinary "tickets" for "possession of excess food materials," although Plaintiff himself did not receive a disciplinary ticket. (*Id.*) Later that same day, Plaintiff received a letter from an employee in the Placement and Assignment Office (also a non-party) advising him that he had

2

been terminated from his job assignment based on "staff recommendations" and for "administrative reasons." (*Id.* ¶ 19.) The letter made no mention of the food tray issue. (*Id.*) Plaintiff believes that the "staff recommendations" came from Shaw and/or Hudson. (*Id.*)

Plaintiff filed another grievance with Hudson the same day he received the letter, this time alleging that his termination from his job in the kitchen was retaliation for his earlier grievance about Shaw. (*Id.* ¶ 23.) On September 16, 2015, Hudson responded to Plaintiff's second grievance by stating:

> Job assignments are a privilege and, in accordance with Department Rule 420, Assignment of Committed Persons, a committed person may be removed from his assignment and/or reassigned by the Chief Administrative Officer or by the Assignment Officer with subsequent approval by the Chief Administrative Officer. Removal and/or reassignment shall be based upon matters including, but not limited to, the committed person's inability or incompetence in performing or completing the assignment, disciplinary reasons, the committed person's request for assignment change, staff recommendations, security or administrative reasons.

(*Id.* ¶ 24.) Later that same day, Plaintiff had a conversation with Hudson while Hudson was making his rounds. (*Id.* ¶ 25.) Plaintiff asked Hudson why he had not yet responded to Plaintiff's original grievance from September 2. (*Id.*) He allegedly responded by questioning "what kind of relief" Plaintiff could "possibly get" from the September 2 grievance, and stating that it was unlikely Shaw was "ever going to admit threatening" Plaintiff. (*Id.*) According to Plaintiff, Hudson refused to investigate his September 2 grievance. (*Id.*)

After this conversation, Plaintiff filed an appeal of Hudson's "refusal to conduct even a cursory investigation" into his grievance about Shaw. (*Id.* ¶ 26.) No response was forthcoming, however, and over the course of the several months Plaintiff submitted numerous "Offender Request Slips" seeking a response to his appeal. (*Id.* ¶ 28.) On March 7, 2016, McBee, a grievance officer at Stateville, issued a written denial of Plaintiff's appeal. (*Id.* ¶ 29.) Plaintiff complains that McBee did not contact him when making his decision and instead "simply

3

rubber-stamped the prior decision without any independent analysis." (*Id.*) Plaintiff appealed further, and the following day Pfister, the warden at Stateville, issued a decision in which he "concurred with Officer McBee's response." (*Id.* ¶ 32.) Plaintiff complains that Pfister failed to "provide any comments" in his written decision or "contact [Plaintiff] or any other witnesses who could have corroborated [Plaintiff's] allegations." (*Id.* ¶ 33.) In Plaintiff's view, this shows that Pfister "merely acquiesced" to the decisions of Hudson and McBee. (*Id.*)

On March 11, 2016, Plaintiff appealed the warden's decision to IDOC's Administrative Review Board. (*Id.* ¶ 35.) On July 19, 2016, two members of the board, Benton and Baldwin, denied Plaintiff's appeal. (*Id.* ¶ 36.) Plaintiff criticizes them for not including "any comments" in their written decision and for failing to contact him or otherwise conduct their own independent investigation into his complaint. (*Id.*) He believes these two Defendants also simply "acquiesced" to the decisions of Hudson, McBee, and Pfister. (*Id.*)

## PROCEDURAL HISTORY

On September 23, 2016, Plaintiff filed a *pro se* complaint under Section 1983, along with a motion for appointment of counsel. (R. 1, 4.) This Court granted Plaintiff's motion for appointment of counsel. (R. 5.) Through appointed counsel, Plaintiff filed his amended complaint raising one count against all six Defendants labeled,\"Retaliation Against Protected First Amendment Action." (R. 12, Am. Compl. ¶¶ 41-51.) He claims that Shaw and Hudson violated his First Amendment rights because they had him fired in retaliation for his September 2 grievance. (*Id.* ¶¶ 44-45.) He further alleges that McBee and Pfister "deprived [him] of his First Amendment rights when they failed to evaluate and conduct an investigation into [his] grievance and acquiesced to the unconstitutional retaliation" committed by Shaw and Hudson. (*Id.* ¶ 47.) As to Benton and Baldwin, he claims that they similarly "deprived him of his First Amendment

4

rights" by "failing to evaluate, investigate, and/or otherwise overturn the unlawful termination" when they decided his grievance appeal. (*Id.* ¶ 50.)

Moving Defendants—McBee, Pfister, Benton, and Baldwin—then filed a motion to dismiss under Rule 12(b)(6). (R. 30, Mot.) They argue that Plaintiff has failed to state a claim against them, because they were not personally involved in the decision to terminate him from his job and, under the applicable law, they cannot be held liable simply for denying his grievances. (R. 31, Mem.) Plaintiff objects to the dismissal of these Defendants.[1] (R. 38, Resp.)

## LEGAL STANDARD

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Pursuant to federal pleading standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). With a motion to dismiss, courts must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs' favor." *Roberts v. City of Chi.*, 817 F.3d 561, 564 (7th Cir. 2016).

## ANALYSIS

To state a First Amendment retaliation claim, a plaintiff must allege that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely

---

[1] Moving Defendants had until June 15, 2017, to file a reply in support of their motion, but to date no reply has been received.

deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015). An inmate's use of a prison grievance system constitutes protected First Amendment activity. *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012) ("A prisoner has a First Amendment right to make grievances about conditions of confinement." (citation omitted)). Thus, prison officials cannot retaliate against an inmate for filing a grievance. *Perez*, 792 F.3d at 783.

Moving Defendants do not dispute that Plaintiff has adequately alleged that he engaged in protected First Amendment activity when he filed a grievance about Shaw. Nor do they take issue with the sufficiency of his allegations showing that he suffered a deprivation that would likely deter First Amendment activity, or that Shaw and Hudson were motivated at least in part by the grievance when they allegedly had him terminated. But as to *them*, they argue that nowhere in the amended complaint is it alleged that they had any personal involvement in the deprivation that forms the basis of Plaintiff's retaliation claim—his termination.[2] (R. 31, Mem. at 5-6.) The Court agrees that Plaintiff has failed to state a viable claim against these Defendants.

Section 1983 imposes a system of individualized liability, and there is no general *respondeat superior* liability. *Perez*, 792 F.3d at 781. Thus, state actors can only be held liable for their own misconduct, not for the acts or omissions of another state actor. *See Burks v.*

---

[2] The Court notes that Plaintiff has no constitutional claim arising from the loss of his job itself. *Soule v. Potts*, 676 F. App'x 585, 586 (7th Cir. 2017) ("The Constitution does not give prisoners any substantive entitlements to prison employment."); *DeWalt v. Carter*, 224 F.3d 607, 613 (7th Cir. 2000) (observing that prisoners have no constitutionally protected "liberty or property interest in their jobs"). Nevertheless, "[a]n act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper." *Gomez*, 680 F.3d at 866 (citation omitted). Thus, prison officials cannot terminate an inmate from a prison job or deny him other privileges in retaliation for the exercise of his First Amendment rights. *See DeWalt*, 224 F.3d at 613.

6

*Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009) ("[P]ublic employees are responsible for their own misdeeds but not for anyone else's."). To state a viable claim under Section 1983, then, the plaintiff must allege "that the defendant, through his or her own conduct, has violated the Constitution." *Perez*, 792 F.3d at 781.

Plaintiff's amended complaint makes clear that the alleged act of retaliation—his termination—had already occurred when Moving Defendants became involved in these events. They are not alleged to have caused or participated in the decision to fire him. Instead, Plaintiff is trying to hold them liable for failing to investigate his grievances and/or "overturn" the alleged retaliatory action by Shaw and Hudson. (R. 12, Am. Compl. ¶¶ 50-51.) This does not state a claim for relief. As the U.S. Court of Appeals for the Seventh Circuit has explained:

> Public officials do not have a free-floating obligation to put things to rights . . . . [The] view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right.

*Burks*, 555 F.3d at 595. In other words, simply receiving a grievance and failing to rule on it in the manner Plaintiff wanted does not make these officials liable for a First Amendment violation committed by other prison personnel. "Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation. A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not." *George v. Smith*, 507 F.3d 605, 609-10 (7th Cir. 2007); *see also Estate of Miller v. Marberry*, 847 F.3d 425, 428 (7th Cir. 2017) ("[P]rison officials who reject prisoners' grievances do not become liable just because they fail to ensure adequate remedies."). This case law dooms Plaintiff's claims against Moving Defendants.

To avoid dismissal, Plaintiff cites to language in district and appellate court cases predating *Burks* and *George* for the principle that receipt of a grievance can form the basis for Section 1983 liability. (*See* R. 38, Resp. at 5-6.) The law on this issue has evolved, however, and this Court is required to follow the clear language of *Burks* and *George*, which severely constrained the liability of individuals who decide prison grievances. Plaintiff also argues that the Seventh Circuit case law does not create a "bright line rule" prohibiting all claims against grievance examiners or other prison officials who receive correspondence about an inmate's problem. (*Id.* at 5.) The Court would agree with this assessment. *Burks* itself suggests that a prisoner may have a viable Section 1983 claim where a grievance examiner carries out his or her duties "with deliberate indifference to the risks imposed on prisoners," for instance, where he or she is made aware that an inmate is experiencing a painful medical condition that is not being treated by medical staff and simply sends the grievance "to the shredder." *Burks*, 555 F.3d at 595. In such situations, the grievance examiner's *own actions* can be said to exhibit deliberate indifference to the inmate's health or safety. *Id.*; *see also Gray v. Hardy*, 826 F.3d 1000, 1002, 1008 (7th Cir. 2016) (holding that warden's failure to respond to prisoner's grievance complaining that he was living in a cell infested with "vermin, insects, and birds," which was causing him health problems, was sufficient to support a deliberate indifference claim against the warden); *Perez*, 792 F.3d at 781-82 (observing that when prison officials receive correspondence alerting them to "an excessive risk to inmate safety or health" and they do nothing, they may be held liable for deliberate indifference).

But this exception is of no assistance to Plaintiff. He is not alleging an Eighth Amendment claim based on an excessive risk to his health or safety, where the failure to act by prison officials who became aware of his problem might show deliberate indifference that could

8

be attributed to them personally. Rather, he is raising a First Amendment claim premised on a one-time wrongful act—his termination from his job in the kitchen. *George*, 507 F.3d at 609-10. The mere fact that Moving Defendants became aware of Plaintiff's termination after it occurred does not make them liable for the alleged wrongful acts of Shaw and Hudson. *See Burks*, 555 F.3d at 595. Nor can Moving Defendants be held liable for failing to step in and "overturn" the termination. *George*, 507 F.3d at 609-610; *see also Hoban v. Godinez*, 502 F. App'x 574, 578 (7th Cir. 2012) (holding that warden and IDOC official could not be held liable simply for failing to "overrule" their subordinate's allegedly improper conduct when they decided prisoner's grievance).

To the extent Plaintiff is claiming that the mishandling of his grievances *itself* violated his constitutional rights, such a claim has no merit. "Prison grievance procedures are not mandated by the First Amendment and do not by their very existence create interests protected by the Due Process Clause[.]" *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011). Thus, "the alleged mishandling of [a prisoner's] grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim." *Id.*; *see also McGee v. Adams*, 721 F.3d 474, 485 (7th Cir. 2013) (affirming dismissal of prisoner's claims against defendants whose only involvement in the events underlying the complaint was to "rule[ ] against [him] on the institutional grievances he filed with respect to these incidents"); *Lee v. Gowdy*, No. 12 C 9503, 2012 WL 6605400, at *2 (N.D. Ill. Dec. 18, 2012) (applying *Owens* and *George* to dismiss defendants where liability was premised solely on "their denial or improper handling of Plaintiff's grievances"). For these reasons, Moving Defendants must be dismissed.

A plaintiff ordinarily should be permitted an opportunity to file an amended complaint before a claim is dismissed with prejudice. *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014,

1024-25 (7th Cir. 2013). However, it is unnecessary to grant leave to amend when there is "undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th Cir. 2009). This case has been pending for nearly a year, and Plaintiff has already amended his complaint once. (R. 1, Compl.; R. 12, Am. Compl.) He does not specifically request leave to amend in his response to the motion to dismiss. (*See* R. 38, Resp.) Nor does he suggest any possible amendments to his complaint that might overcome *George* and *Burks*, and the Court can conceive of none. Under these circumstances, the dismissal will be with prejudice.

## CONCLUSION

For the foregoing reasons, the motion to dismiss (R. 30) is GRANTED. Defendants Anna McBee, Randy Pfister, Sherry Benton and John Baldwin are DISMISSED with prejudice. The parties are directed to exhaust all settlement possibilities for the remaining portion of this lawsuit in light of this opinion. The parties shall appear for a status hearing on August 30, 2017, at 9:45 a.m. for the purpose of setting a firm trial date.

ENTERED:

Chief Judge Rubén Castillo
United States District Court

Dated: July 26, 2017

10